# Tallman's Estate.   Tallman's Appeal.

*Issue devisavit vel non—Testamentary capacity—Undue influence—Evidence insufficient to go to jury.*

An issue devisavit vel non should not be directed unless there is sufficient evidence in the case of the alleged lack of testamentary capacity, or alleged undue influence, *to justify the court in sustaining a verdict of the* jury setting aside the will.

Argued March 14, 1892. Appeal, No. 396, Jan. T., 1891, by William Tallman, petitioner, from decree of O. C. Lycoming Co., refusing an issue devisavit vel non, to try the validity of

the will of Lucy Tallman, deceased.   Before PAXSON, C. J.,
STERRETT, WILLIAMS, McCOLLUM and HEYDRICK, JJ.

The facts as they appeared on depositions taken before a
commissioner were summarized in the opinion of the orphan's
court, METZGER, P. J., which was as follows:

" In Herster v. Herster, 122 Pa. 239, and many other cases
which we deem it unnecessary to cite, the Supreme Court laid
down the rule that an issue should not be directed where the
evidence is of such unsatisfactory character that the court
would not sustain a verdict against the will.

" We have carefully examined all the testimony submitted,
and fail to find a sufficient dispute of material facts to warrant
us in awarding the issue prayed for.   The testimony is wholly
insufficient to sustain the allegation of testamentary incapacity
or that of undue influence.

" The strongest inference that could be drawn from the con-
testant's testimony, standing alone, is that possibly there might
have been some slight impairment of the intellect of Lucy
Tallman, during the latter years of her life.   Not a single wit-
ness testifies on the part of the contestant, as an expert, that
she was even of unsound mind, and not a single witness, either
as an expert or non-expert, testified that she had no testamen-
tary capacity.   A number of non-experts gave it as their opin-
ion that she did not seem to be of sound mind, but the facts
upon which they base their opinion are, in our judgment, in-
sufficient to support such a conclusion.   There is an utter ab-
sence of testimony showing an inability on her part to transact
business or a mental incapacity to make a will.   The facts tes-
tified to prove that she was filthy in her habits, extremely vul-
gar at times, penurious and miserly to such an extent as to
deprive herself of the comforts of life, but in all this there is
nothing to evidence a lack of intelligence in reference to her
property and the management of her business affairs.

" When we view the whole evidence, we cannot conclude
otherwise than that she was, in business affairs, a woman of
more than ordinary shrewdness.   From nothing at all she ac-
quired, by her own unaided exertions, property to the amount
of upwards of twenty thousand dollars.   She had been reared
in adversity, and being an illegitimate child, was cut off from

social standing, and during her early life of poverty had acquired penurious habits which naturally grew upon her, until, in her latter years, she was close and miserly to such a degree as to subject her to the criticism of those who thought she should use her property for her own comfort. She not only acquired her property by her own industry and frugality, but managed it throughout all her life, until at least two years after the making of the will in question, in an intelligent way and businesslike manner. She leased her property, collected her rents and looked after her estate, at the time and subsequent to the execution of this will, as she had always done before. She made purchases, hired men to make repairs on her property, made bargains, and yet not one single improvident business transaction is proven against her. On the other hand, instances are given in which she exhibited the possession of more than an ordinary memory for one of her age.

" On the part of the respondent, the evidence of her testamentary capacity is so overwhelming as to remove all doubt on the subject. A number of witnesses, including several experts, testify to her business as well as testamentary capacity, and the reasons they give upon which they base their judgment, would leave us in no doubt, even if we did not have the testimony of the scrivener and subscribing witnesses to the will. Both subscribing witnesses were called by proponents, and both testify to her testamentary capacity at the time of the execution of the will. The scrivener also testified very fully and gave the details of the interview he had with her when she gave him the memorandum from which he drew up the will in form. He testifies in substance that she dictated the provisions of the will, and had a distinct understanding of the property she possessed and the disposition she desired to make of it. He states, inter alia : ' I never wrote the will of a person who had a clearer knowledge than she had of her entire property and of the manner of disposing of it. All of the terms of the will and the disposition of the several properties as to life estates, and other dispositions of that kind, were her own suggestions, for which she had her reasons.' He further states that ' She was in good spirits and talked freely on all subjects and topics that were mentioned in conversation. I saw nothing from the beginning to the end to lead me to sus-

pect in the slightest degree anything wrong with her mentally. Her manner was that of a person entirely sane and a person of fair intelligence—not only her manner, but her language. I had no doubt upon that subject at that time.' After the will was drawn up in form it was read to her, and as the items were read over she approved them, usually with some remarks, giving reasons for making such disposition.

" We find nothing in the testimony in conflict with that of the scrivener and the subscribing witnesses, and there is no evidence which raises a dispute within the meaning of the act of assembly upon the question of the testamentary capacity of the testatrix. It has been alleged that she made a previous will, different in its provisions from this one, but the reasons given for changing the will were rational, and it is shown that the change was contemplated long before it was made. Neither was there anything in the fact that she only gave to her brother ten dollars. It is not disputed but that for the last twenty years, or ever since the death of her mother, she always stated that this amount was all that he should receive out of her estate, giving as a reason therefor the undisputed fact that said sum was all that she received under her mother's will, while he received all the residue. We have also the undisputed fact that she always stated that those who took the best care of her should have her property.

" The testimony in this case clearly brings her within the rule laid down in Wilson v. Mitchell, 101 Pa. 502, in which a person of sound and disposing memory is defined to be 'one who has a full and intelligent knowledge of the act he is engaged in and full knowledge of the property he possesses ; an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty. It is not necessary that he collect all these in one review ; if he understand in detail all that he is about, and chooses with understanding and reason between one disposition and another, it is sufficient for the making of a will.' See also Daniel v. Daniel, 39 Pa. 191 ; Tawney v. Long, 76 Pa. 106.

" We must also bear in mind that the testatrix could hardly be said to have had any natural objects of bounty. Although nearly 70 years of age when she died, she never was married

and left to survive her neither parents nor child. Being an illegitimate child, she had no relations which at common law could have inherited from her. In fact, William Tallman, the contestant, being also an illegitimate child, although having the same mother, would have no status to contest the will of Lucy Tallman were it not for the act of June 5, 1883, P. L. 88. Without this statute, which was passed less than three years before the execution of the will in controversy, William Tallman could have no more contested this will than a stranger.

"But it is further contended that the will was procured to be executed by the testatrix by undue influence. The testimony relied on by the contestant to establish this ground for contest is, principally, that the legatees were tenants of the testatrix, visited her frequently, often furnished her with meals, took her out riding, and seemed to pay a great deal of attention to her both in sickness and in health. Also that Lucy₀ Tallman made certain declarations, of which we will speak hereafter.

"It might be possible that the acts of neighborly kindness shown her by the Swartz family might have created in her a disposition to reward them in this way. But would acts of this character be the exercise of undue influence? Certainly not. Such acts were not only lawful but commendable. In Dean v. Negley, 41 Pa. 317, Chief Justice LOWRIE, in delivering the opinion of the court, says: 'Lawful influence, such as that arising from legitimate family and social relations, must be allowed to produce its natural results, even in influencing last wills. However great the influence thus generated may be, it has no taint of unlawfulness in it, and there can be no presumption of its actual unlawful exercise merely from the effects it is known to have exercised, and that it has manifestly operated upon the testator's mind as a reason for his testamentary dispositions. . . . No will can be condemned because such an influence is proved, and because the will itself contains proof of its effect. It is only when such influence is unduly exercised while in the act of devising so as to prevent the will from being truly the act of the testator that the law condemns it as a vicious element of the testamentary act.'

"There is not, in our judgment, a scintilla of evidence show-

ing or tending to show that M. K. Swartz or any of his family ever made any misrepresentations to her, or did any act by which she might have been deceived, or that any of them ever suggested to the testatrix the making of the will in controversy. The declarations alleged to have been made by Lucy Tallman subsequent and prior to the making of the will are of a trifling and unimportant character, except those testified to by William Tallman, the contestant. He states in his testimony as follows : ' She told me she had made a will—the Williamson will. She afterwards told me she had burned it. This was in the fall of 1885. She said the Swartzes wanted her to make another will. I told her not to do so, and she said she would not. In the spring of 1886 she told me that the Swartzes had deviled her until she had given them everything except the old carpets, and now they wanted them. She said she could not keep them away.'

" The fact that there is no other evidence in this case showing the exercise of undue influence, taken in connection with the fact that the testimony clearly shows her disposition to have been such as to make it almost impossible to induce or persuade her, much less to coerce her into doing any act which was not her own voluntary choice, makes this evidence valueless. Finding, as we have, from the testimony, that she was mentally competent to make a will, and it having been executed more than three years prior to her death, during which time it remained subject to cancellation or change at her pleasure, such declarations, made some months before or some months after the execution of the will, cannot be allowed to set it aside. It was said by Justice LOWRIE, in the case of Hoshauer v. Hoshauer, 26 Pa. 404 : ' A man who is competent to make a will can so easily correct any of its provisions, however obtained, that it is hard to imagine any kind of declarations of his that would prove it fraudulent when any considerable time has intervened between its execution and his death.' In Tawney v. Long, 76 Pa. 115, one of the issues was undue influence. In that case, Henry Long and wife, the contestants, testified that the testator had declared to them that John E. Tawney had been dingdonging at him to make his will and leave all he had to him and his family. Chief Justice GORDON, in delivering the opinion of the court, says : ' All these decla-

rations prove nothing.   All such solicitations as do not affect
the validity of a will, even importunate persuasion, from which
a delicate mind would shrink, would not invalidate a devise.'
In  Trost v. Dingler, 118 Pa. 269, the same principle was af-
firmed.   Chief Justice GORDON, in that case, after citing several
authorities, says : ' According to these cases, undue influence
may be exercised either through threats or fraud.   But how-
ever used, it must, in order to avoid a will, destroy the free
agency of the testator at the time and in the very act of making
the testament.   Solicitations, however importunate, cannot, of
themselves, constitute undue influence.   Though these may
have a constraining effect, they do not destroy the testator's
power to freely dispose of his estate.'

"But, from the entire evidence in this case, it seems tolerably
clear to us that if such statements or declarations as those testi-
fied to by the contestant were made, there was not only no
truth in them, but they were made by her to allay his suspicion
and jealousy.   It appears absurd to assume that such a decla-
ration as that ' They had deviled her until she had given them
everything but her old carpets, and now they wanted them,'
should have been seriously made by the testatrix to the contes-
tant three years prior to her death, and yet that he should have
taken no steps during her lifetime to have her correct it, which
would have been an easy matter to have done, by changing or
canceling the will.   It is equally as absurd, in view of her dis-
position, as disclosed by the evidence in this case, that she
should have been conscious all this while of having executed a
will under constraint, and yet not attempt to change or alter it.

"We find nothing in this case, in the evidence submitted,
which strikes us as sufficient to raise the question of undue in-
fluence.   We have no fault to find with the authorities cited by
the learned counsel for the contestant, establishing the princi-
ple that ' Undue influence may be exercised secretly as well as
openly, and this is especially the case where a confidential re-
lation exists between the principal devisee and testator.'   In
the case at bar no confidential relation existed.   The only re-
lation existing between the parties was that of landlord and
tenant.   The will was not dictated by the devisees, or the mak-
ing of it suggested by them or either of them.

"The undisputed testimony is that it was the voluntary act of

the testatrix and made at her suggestion. Nothing was done by any of the devisees, beyond M. K. Swartz, at the request of the testatrix, going for the scrivener, and afterwards for the subscribing witnesses. It seems to us absurd to presume, under all the evidence in this case, that there was undue influence. Such a presumption is negatived by the facts and circumstances proven in the case. The evidence clearly indicates a free and voluntary disposition of the property by a person entirely competent to do so, and therefore we refuse to award the issue prayed for."

*Errors assigned* were, (1) refusing an issue to try the question of want of testamentary capacity; (2) refusing an issue to try the question of undue influence exerted on testatrix; and (3) refusing an issue to test the validity of the alleged will.

*John G. Reading* and *J. A. Beeber*, for appellant.

*H. C. McCormick*, *J. C. Hill* and *S. T. McCormick* with him, for appellees.

PER CURIAM, March 28, 1892:

It may be that, had the evidence in this case been submitted to the jury, they would have made a different will from the one made by the testatrix. If we concede this to be so, it only shows a greater necessity for examining this class of cases with care, as there are few persons in the community who would be willing to submit the distribution of their estates to such a tribunal. There was nothing in this case which ought to have been submitted to a jury to show that the testatrix did not possess testamentary capacity, or that the will was obtained from her by means of undue influence. The issue was properly refused.

The decree is affirmed, and the appeal dismissed at the costs of the appellant.